# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| GARY WEBSTER, Derivatively on Behalf of Nominal Defendant KANSAS CITY SOUTHERN,<br><br>     Plaintiff,<br><br> vs.<br><br>DAVID L. STARLING, DAVID R. EBBRECHT, PATRICK J. OTTENSMEYER, MICHAEL W. UPCHURCH, LU M. CORDOVA, HENRY R. DAVIS, ROBERT J. DRUTEN, TERRENCE P. DUNN, ANTONIO O. GARZA, JR., MICHAEL R. HAVERTY, THOMAS A. MCDONNELL, and RODNEY E. SLATER,<br><br>     Defendants,<br><br> and<br><br>KANSAS CITY SOUTHERN, a Delaware Corporation,<br><br>     Nominal Defendant. | No. _____ |

**VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT FOR BREACHES OF FIDUCIARY DUTIES, CORPORATE WASTE, UNJUST ENRICHMENT, AND AIDING AND ABETTING BREACHES OF FIDUCIARY DUTIES**

Plaintiff, Gary Webster ("Plaintiff"), by and through his undersigned counsel, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") on behalf of Kansas City Southern ("KCS" or the "Company") and against certain current officers and directors of the Company for breaches of fiduciary duties, unjust enrichment, corporate waste, and aiding and abetting thereof. Plaintiff makes these allegations upon personal knowledge as to those allegations concerning Plaintiff and, as to all other matters, upon information and belief derived from the investigation of counsel, which included, without limitation: a) review and analysis of public filings made by KCS and other related parties and non-parties with the U.S. Securities and Exchange Commission ("SEC"); b) review and analysis of press releases and other publications disseminated by certain of the Defendants and other related non-parties; c) review of news articles, shareholder communications, and postings on KCS's website concerning the Company's public statements; d) pleadings, papers, and any documents filed with and publicly available from the related pending securities fraud class action, *Gross v. Kansas City Southern, et al.*, No. 4:14-cv-00345-BCW (W.D. MO) (the "Securities Class Action"); and e) review of other publicly available information concerning KCS and the Individual Defendants (defined herein).

## NATURE AND SUMMARY OF THE ACTION

1. This action arises out of the Individual Defendants' breaches of fiduciary duties and aiding and abetting thereof specifically relating to certain false statements the Individual Defendants either made, or caused the Company to make regarding its business, prospects, and operations.

2. KCS was founded in 1887 with the goal of connecting the U.S. heartland to the Gulf of Mexico. The Company's wholly-owned operating subsidiary is the Kansas City Southern Railway ("KCSR"), a Class I railroad headquartered in Kansas City, Missouri. Unlike other U.S. railways, KCSR's tracks run primarily south and north, rather than east and west. Due to the Company's geographic placement, KCSR benefitted from the passage of the North American Free

Trade Agreement ("NAFTA") in 1995 and is sometimes known as "The NAFTA Railroad" because its operations carry goods between the Midwest and Mexico.

3.      KCS operates its Mexican railroad under a 1997 government concession that purportedly extended to 2027.  According to the "KCS Concession," KCS had the exclusive right to use, but did not own, all track and buildings necessary for its Mexican operation.  Under the KCS Concession and Mexican law, the Company was also free to set rates unless the Mexican government determined that there was no effective competition in Mexico's rail industry.

4.      Mexican Railroad Services Law and regulations and the KCS Concession established several circumstances under which the KCS Concession would terminate early: revocation by the Mexican government, statutory appropriation, or KCS's voluntary surrender of its rights or liquidation or bankruptcy.  If the KCS Concession was revoked by the Mexican government, KCS would receive no compensation.

5.      Such a revocation would be catastrophic to KCS as the Company derives a substantial portion of its revenues from Mexico.  In fact, according to a February 18, 2014 Bloomberg report, KCS obtained approximately 46% of its 2013 revenues from Mexico.

6.      In order to help preserve its relationship with the Mexican government and with it, the lucrative KCS Concession, the Company, as part of the KCS Concession was required to undertake capital projects, including those described in a business plan filed every five years by KCS with the Mexican government.

7.      Aside from preserving its highly lucrative arrangement with the Mexican government, the Individual Defendants needed to improve the Company's credit rating, which until February 2013 was rated as junk, in order to facilitate the restructuring of costly corporate debt at lower interest rates.  This in turn, would allow the Company to report lower expenses and higher profits.  Further,

until the Company successfully obtained an investment grade corporate debt rating, its debt instruments and revolving credit facility would continue to contain prohibitive negative covenants.

8.     The only way to improve the Company's credit rating was to demonstrate to the investment community and to the corporate debt rating agencies in particular, that the Company's business metrics and financial prospects were deserving of an investment grade debt rating.

9.     Specifically, on January 22, 2013, the Individual Defendants caused the Company to issue a press release announcing its 4Q and 2012 financial results touting "Record Fourth Quarter and Full-Year 2012 Revenues, Carloads and Operating Income." Later that day, the Individual Defendants caused the Company to provide a fiscal 2013 guidance that – if met – would convince the rating agencies to upgrade the Company's corporate debt ratings to investment grade. Predictably, the market reacted positively to the news, sending shares of KCS up nearly 5 percent to a then all-time high price of $91.67.

10.    Less than a month later, on February 20, 2013, William H. Galligan ("Galligan"), KCS's Head of Investor Relations, disclosed that KCS was "in very serious negotiations with a third party that has interest to build a crude facility on our property in Port Arthur, Texas," and further noted that the impact on the Company's revenues and earnings would be a "game changer," and that that impact could hit as early as 2014. As this news was analyzed and absorbed by the market, and positive reports flowed from analysts regarding this "game changer," the price of KCS stock climbed to new heights, increasing from $96.68 per share on February 20, 2013, to a robust $103.13 per share on February 27, 2013.

11.    Following the Company's positive 4Q and 2012 financial results and optimistic 2013 guidance, as well as the disclosure of "serious negotiations" that would be a "game changer" as far as the impact on the Company's revenues and earnings, both Standard & Poor's Ratings Services

("Standard & Poor's") and Moody's Investors Service ("Moody's") upgraded KCS's corporate debt rating to investment grade.

12.     On April 19, 2013, before the opening of trading, the Individual Defendants caused KCS to issue a press release reporting its financial and operating results for the first quarter 2013 ended March 31, 2013, again touting record results.  The press release also noted that KCS achieved investment grade ratings from all three major rating agencies.

13.     Later that day, during a conference call held with investors and analysts, the Individual Defendants caused the Company to report that it was still on track to achieve if not beat the financial guidance issued on January 22, 2013.  During the call it was also emphasized that the Company's new investment grade status would be put to work quickly, which would have a positive impact on the Company's capital structure and expenses going forward.  Finally, during the call, the Company further touted the "game changer" announcement about the ongoing negotiations to expand the Port Arthur crude oil terminal and recognized the analyst jubilation about the negotiations.  On this news, the price of KCS stock increased more than $3 per share from its close of $102.78 per share on April 18, 2013, to close at $105.85 per share on April 19, 2013.

14.     On April 29, 2013, taking advantage of its newfound investment grade credit rating, the Company filed a Current Report on Form 8-K with the SEC explaining that the Company had privately placed more than $1.175 billion in debt.

15.     Then, on July 19, 2013, before the opening of trading, the Individual Defendants caused KCS to issue more positive financial news again announcing record results, this time for the second quarter 2013 ended June 30, 2013.  During a conference call held with investors later that afternoon, the fortuitous timing of the Company's private debt placement during the quarter was specifically noted.

16.    On October 18, 2013, before the opening of trading, the Individual Defendants caused KCS to issue a press release reporting its financial and operating results for the third quarter 2013 ended September 30, 2013, in which it once again touted record results, specifically stating that "Kansas City Southern Reports Record Revenues and Carloads, Driven by Strong Cross-Border Revenue Growth."

17.    Later that same day, following the issuance of the Company's 2013 third quarter financial results, additional positive statements were made to investors and analysts on a conference call scheduled to discuss the Company's financial condition and its outlook.  Specifically, during the call it was announced that the Company was still on track to achieve – if not beat – the financial guidance issued on January 22, 2013.  Further, it was noted that while the "fourth quarter for utility coal [would] look a little bit worse than last year" and the "full year 2013 [would] be a little worse than all of 2012 for utility coal," "growth in frac sand and crude oil [would] still push the Energy business unit overall into positive single-digit territory."  During the call, the Company also advised that it was "still expecting double-digit growth in Automotive for 2013 in spite of a drop in growth rates during the third quarter," as it would "begin to see some activity from the new Nissan plant in December," "[a]nd the Honda and Mazda plants [were] opening in the Salaya area in the first quarter of 2014."  Additionally, Starling emphasized that "you could be assured that we'll maintain stringent control of our operating costs, which will further enhance profitability," and that the Individual Defendants "remain[ed] very bullish on the opportunities [the Company's] franchise provides for the next several years and beyond."

18.    On that same day, October 18, 2013, *Reuters* reported that because the Company "gets almost half of its revenue from Mexico," the "strength of its cross-border business has placed Kansas City Southern in a better position than most U.S. railroads, whose heavy dependence on coal

shipments has hurt them since early 2012 as demand for the fuel has slumped." *Reuters* also confirmed that the Company "said it expects a strong end to the year as cross-border business grew." Cross-border shipments were expected to ramp-up particularly in auto as early as the 2014 first quarter, with several auto manufacturers scheduled to bring new plants on line in Mexico.

19.     The price of KCS common stock again shot up on these positive statements, increasing more than $4 per share to close at $117.15 on October 18, 2013, and continued its upward trend for almost 30 days culminating in a price of $125.96 per share in intraday trading on November 14, 2013, which would be the highest point the stock would reach between January 2013 and February 2014.

20.     Looking to further take advantage of the Company's bloated stock price, on October 24, 2013, the Company announced that its two wholly-owned operating subsidiaries, KCSR and Kansas City Southern de Mexico ("KCSM"), were again raising hundreds of millions of dollars in private debt placements not registered under the Securities Act of 1933.

21.     On that same day, and expressly relying on the false but positive statements made on October 18, 2013, Moody's assigned a rating of Baa3 and Fitch assigned a rating of BBB- to the new senior notes offered by KCSR and KCSM.

22.     Following months of positive news and projections, on January 24, 2014, KCS started to come off the rails.  On that day, the Individual Defendants caused KCS to issue a press release announcing significant misses for both the fourth quarter 2013 and fiscal 2013, which ended on December 30.  Specifically, despite KCS's bullish statements throughout the year, the Company announced significant misses on net income and revenues for fourth quarter 2013 and a significant net income miss for fiscal 2013.  Additionally, while the Company's Operating Ratio, an important metric focused on by the Company, decreased to 67.8% for the 2013 third quarter, and the market

was led to believe on October 18, 2013 that it was continuing to decline, the Company's Operating Ratio actually increased in the fourth quarter of 2013.

23.     The negative news continued during a call with investors that followed the Company's earnings release. Aside from recapping the Company's lackluster, underperforming fourth quarter and fiscal 2013, it was also disclosed that: 1) KCS's Energy business actually declined 17% in the 2013 fourth quarter, led by significant decreases in the Company's utility coal volumes and declining crude oil shipments; 2) Carloads in the Company's Chemical & Petroleum business declined; 3) the ramp-up of the Company's Mexican automotive shipment business was not advancing as quickly as the market was led to believe; and 4) operating expenses increased. Not surprisingly, the Company also offered a disappointing earnings growth outlook for fiscal 2014, forecasting per-share earnings for 2014 to rise only in the mid-teens versus the mid-twenties the investment community had been led to expect due to the bullish statements the Individual Defendants caused the Company to make.

24.     In response to the Company's announcement, on January 24, 2014, the price of KCS common stock declined $17.79 per share – more than 15% - from its close of $117.28 per share on January 23, 2013 to close below $100 per share. In all, the price of KCS common stock declined *more than $26 per share* from its high of $125.96 per share on November 14, 2013, *erasing a whopping $2.9 billion in market capitalization.* On January 27, 2014, Raymond James & Associates, Inc. downgraded KCS stock confirming that "Kansas City Southern's commentary largely reset earnings expectations to more achievable levels in addition to lowering valuation."

25.     More bad news awaited investors on the other side of the tracks. On February 18, 2014, the market learned that the lower house of the Mexican legislature had approved a new bill to increase rail competition in Mexico which, if it passed Mexico's Senate, would give third-party

companies access to KCS's now-exclusive freight and passenger rail networks. Indeed, as was reported in *The Wall Street Journal* on February 19, 2014, the Mexican government had long been dissatisfied with KCS's performance under the KCS Concession and Company officials had known of that discontent and the threat to the profits on the Company's Mexican operations.

26.     This revelation sent the price of KCS stock tumbling further, closing down more than $4 per share on February 18, 2014 alone.

27.     Indeed, from January 2013 into February 2014, the Individual Defendants failed to disclose that: 1) the Company's exclusivity agreement with Mexico for railway shipping was in jeopardy; 2) KCS's utility coal volumes and crude oil shipments declined more significantly than the market was led to anticipate; 3) the Port Arthur crude oil terminal "game changer" partnership which was much bragged about by the Company was riddled with operational difficulties pushing anticipated financial benefits off further than the market was led to expect; 4) the Company's Chemical & Petroleum shipments to Mexico had declined due to operational issues with the Company's customers in Mexico; and 5) the anticipated increase in KCS's Mexican auto shipment business was not materializing to the extent the market was led to believe as the new plants were not coming on line making the financial benefit for 2014 negligible. In light of the foregoing, there was no reasonable basis for positive statements about the Company's "strong" business performance.

28.     The KCS Board of Directors ("Board") has not, and will not commence litigation against the Individual Defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to KCS for authorizing or failing to correct the false and misleading statements alleged herein. Accordingly, a pre-suit demand upon the Board is a useless and futile act. Thus, Plaintiff rightfully brings this action to vindicate KCS's rights against its wayward fiduciaries and hold them responsible for the damages they have caused KCS.

## JURISDICTION AND VENUE

29.     This Court has jurisdiction over all claims under 28 U.S.C. §1332 because there is complete diversity among the parties and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.  This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

30.     Venue is proper in this Court because one or more of the Defendants either resides in or maintains executive offices in this District, including nominal defendant KCS, a substantial portion of the transactions and wrongs complained of herein occurred in this District, and Defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

31.     In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the New York Stock Exchange ("NYSE").

## PARTIES

32.     Plaintiff is a stockholder of KCS and has been so, continuously, since August 17, 2012.  Plaintiff is a citizen of Wyoming.

33.     Nominal Defendant KCS, is a Delaware corporation with its principal place of business located at 427 West 12th Street, Kansas City, Missouri 64105.  KCS, through its subsidiaries, engages in the freight transportation business.  The Company's stock is traded on the NYSE under the ticker symbol "KSU."  There are more than 100 million shares of KCS issued and outstanding.

34.     Defendant Starling has been a director of KCS since May 2010 and has served the Company as its President and Chief Executive Officer ("CEO") since August 2010.  Starling has

also served as a director, President, and Chief Executive Officer of KCSR since July 1, 2008. He has also served as Vice Chairman of the board of directors of KCSM since September 2009. Starling sits on the Company's Executive Committee. Starling received $3,347,314 in total compensation in 2011, $4,811,903 in 2012, and $4,932,087 in 2013. Starling is a citizen of Missouri.

35. Defendant David R. Ebbrecht ("Ebbrecht"), at all relevant times, served as KCS's Executive Vice President and Chief Operating Officer ("COO"). Ebbrecht has served in this capacity since August 2012. Ebbrecht received $1,683,788 in total compensation in 2012 and $1,571,211 in 2013. Ebbrecht is a citizen of Missouri.

36. Defendant Patrick J. Ottensmeyer ("Ottensmeyer") has served as the Company's Executive Vice President Sales & Marketing since October 2008. Ottensmeyer received $1,309,969 in total compensation in 2011, $1,655,878 in 2012, and $1,653,089 in 2013. Ottensmeyer is a citizen of Missouri.

37. Defendant Michael W. Upchurch ("Upchurch"), at all relevant times, served as KCS's Executive Vice President and Chief Financial Officer ("CFO") and has done so since October 2008. Upchurch received $1,225,303 in total compensation in 2011, $1,609,880 in 2012, and $1,613,662 in 2013. Upchurch is a citizen of Kansas.

38. Defendant Lu M. Cordova ("Cordova") has been a director of KCS since May 2010. Cordova is a member of the Board's Audit and Nominating and Corporate Governance Committees. In 2013, Cordova received $180,667 in total compensation for serving on the Board. Cordova is a citizen of Colorado.

39. Defendant Henry R. Davis ("Davis") has been a director of KCS since February 2008. Davis sits on the Company's Nominating and Corporate Governance and the Compensation and

Organization Committees. In 2013, Davis received $172,250 in total compensation for serving on the Board. Davis resides in Mexico City.

40.     Defendant Robert J. Druten ("Druten") has been a director of KCS since July 2004. Druten is the Chairman of the Audit and Finance Committees and is a member of the Board's Nominating and Corporate Governance Committee. In 2013, Druten received $228,771 in total compensation for serving on the Board. Druten is a citizen of Missouri.

41.     Defendant Terrence P. Dunn ("Dunn") has been a director of KCS since May 2007. Dunn currently sits on the Nominating and Corporate Governance Committee and is the Chairperson of the Compensation and Organization Committee. In 2013, Dunn received $212,300 in total compensation for serving on the Board. Dunn is a resident of Missouri.

42.     Defendant Antonio O. Garza, Jr. ("Garza") has been a director of KCS since May 2010. From October 2009 until joining the KCS Board, Garza served on the Advisory Council of KCSM. Garza also serves as a director of KCSM, serving on that board since October 2011. Garza has served as counsel to the Mexico City office of the law firm of White & Case, LLP since 2009. White & Case has acted as outside legal counsel to KCSM for over ten years. In 2013, Garza received $182,300 in total compensation for serving on the Board. Garza is a member of the Finance Committee. Garza resides in Mexico City.

43.     Defendant Michael R. Haverty ("Haverty") was Executive Chairman of the Board of KCS from January 1, 2001 through September 30, 2013. He has been a director of KCS since May 1995. On October 1, 2013, Haverty became the non-executive Chairman of the Board of KCS. Haverty was the Company's CEO from July 2000 until July 2010 and its President from July 2000 to June 2006. Haverty received $2,376,354 in total compensation in 2011, $3,068,366 in 2012, and

$2,648,497 in 2013. Haverty is the Chairman of the Board's Executive Committee. Haverty is a citizen of Missouri.

44.    Defendant Thomas A. McDonnell ("McDonnell") has been a director of KCS since March 2003. He served as a director of DST Systems, Inc. ("DST") from 1971 until his retirement on December 31, 2012, and as Chief Executive Officer of DST from 1984 until his retirement in September 2012. DST was spun off from KCS in 1995. Prior to that, McDonnell served as a director of KCS from 1983 until October 1995. McDonnell was also an officer and director of KCSR before DST was spun off. McDonnell is the Presiding Director of the KCS Board and is a member of the Audit, Nominating and Corporate Governance, Executive, and Finance Committees. In 2013, McDonnell received $238,771 in total compensation for serving on the Board. McDonnell is a citizen of Missouri.

45.    Defendant Rodney E. Slater ("Slater") has been a director of KCS since June 2001. Slater is the Chairperson of the Nominating and Corporate Governance Committee and is a member of the Executive and Compensation and Organization Committees. In 2013, Slater received $182,300 in total compensation for serving on the Board. Slater resides in Washington D.C.

46.    Defendants referenced above in ¶¶34-45 are referred to herein as the "Individual Defendants."

47.    Defendants referenced above in ¶¶34, 38-45 are referred to herein as the "Director Defendants."

48.    Defendants referenced above in ¶¶38, 40, 44 are referred to herein as the "Audit Committee Defendants."

### SUBSTANTIVE ALLEGATIONS

49.    KCS was founded in 1887 with the goal of connecting the U.S. heartland to the Gulf of Mexico. The Company's wholly-owned operating subsidiary is KCSR, a Class I railroad

headquartered in Kansas City, Missouri. Unlike other U.S. railways, KCSR's tracks run primarily south and north, rather than east and west. Due to the Company's geographic placement, KCSR benefitted from the passage of NAFTA in 1995 and is sometimes known as "The NAFTA Railroad" because its operations carry goods between the Midwest and Mexico.

50. KCS operates its Mexican railroad under a 1997 government concession that purportedly extended to 2027. According to the KCS Concession, KCS had the exclusive right to use, but did not own, all track and buildings necessary for its Mexican operation. Under the KCS Concession and Mexican law, the Company was also free to set rates unless the Mexican government determined that there was no effective competition in Mexico's rail industry.

51. Mexican Railroad Services Law and regulations and the KCS Concession established several circumstances under which the KCS Concession would terminate early: revocation by the Mexican government, statutory appropriation, or KCS's voluntary surrender of its rights or liquidation or bankruptcy. If the KCS Concession was revoked by the Mexican government, KCS would receive no compensation.

52. Such a revocation would be catastrophic to KCS as the Company derives a substantial portion of its revenues from Mexico. In fact, according to a February 18, 2014 Bloomberg report, KCS obtained approximately 46% of its 2013 revenues from Mexico.

53. In order to help preserve its relationship with the Mexican government and with it, the lucrative KCS Concession, the Company, as part of the KCS Concession was required to undertake capital projects, including those described in a business plan filed every five years by KCS with the Mexican government. KCS last submitted its five-year plan with the Mexican government in 2012.

54. As KCS entered fiscal 2013, the Company sought to get out from under costly leases on its operating equipment, seeking to raise capital to purchase the equipment outright.

55.     The Company also sought to restructure costly corporate debt at lower interest rates. This would allow the Company to report lower expenses and higher profits. The Company's corporate debt was then rated junk.

56.     According to the Company's annual financial report filed with the SEC on Form 10-K for the period ended December 31, 2012, until the Company successfully obtained an investment grade corporate debt rating, its debt instruments and revolving credit facility would continue to contain negative covenants, including one in its credit facility restricting the Company's "ability to freely deploy proceeds in excess of pre-defined thresholds from insurance settlements or asset sales," which would only "terminate[] upon conversion of KCSM's revolving credit facility from secured to unsecured upon KCSM's attainment of investment grade credit ratings from at least two of the three primary rating agencies."

57.     So, beginning with the Company's report of its 4Q and fiscal 2012 financial results on January 22, 2013, the Company set out to demonstrate to the investment community, and to the corporate debt rating agencies in particular, that the Company's business metrics and financial prospects were deserving of an investment grade debt rating.

58.     In particular, the Company sought to demonstrate that it could significantly decrease its Operating Ratio so that even if carloads and revenues decreased, KCS could report profits.

59.     As explained by www.investopedia.com, an Operating Ratio "shows the efficiency of a company's management by comparing operating expense to net sales," such that the "smaller the ratio, the greater the organization's ability to generate profit if revenues decrease." The Operating Ratio is calculated by dividing operating expense by net sales.

60.     On January 22, 2013, the Individual Defendants caused the Company to issue a press release announcing its 4Q and 2012 financial results touting "Record Fourth Quarter and Full-Year 2012 Revenues, Carloads and Operating Income."

61.     For the 4Q 2012, KCS reported having achieved "record … revenues of $568 million," "an increase of 7% over fourth quarter 2011"; "carloads of 532 thousand, also a record, increased 2% over fourth quarter 2011"; "[o]perating income of $174 million, 15% higher than [4Q 2011]"; an "[o]perating ratio of 69.5%, compared with 71.6% in fourth quarter 2011"; and "[d]iluted earnings per share [of] $0.83" and "[a]djusted diluted earnings per share [of] $0.92."

62.     The Company's earnings release that day also stated that "[f]or the full year of 2012, revenue was a record $2.2 billion, up 7% over 2011"; "[c]arloads for 2012 were 2.1 million, an increase of 5% over the prior year"; "[f]ull-year operating income was $716 million, a 17% increase over the prior year"; "the Company's 2012 operating ratio was 68.0% compared with 70.9% in 2011"; and "[t]he 2012 full-year adjusted operating ratio was 69.9%, a 2.2 point improvement over the prior year's adjusted operating ratio."

63.     During the earnings conference call later that day, Starling, Ebbrecht, Ottensmeyer and Upchurch further discussed the Company's fiscal and 4Q 2012 results and also provided an upbeat guidance that, if met, would convince the rating agencies to upgrade the Company's corporate debt ratings to investment grade.

64.     Specifically, Starling, Ebbrecht, Ottensmeyer and Upchurch stated that the Company was then on track to achieve during fiscal 2013:

- "mid single-digit volume growth along with mid-single digit pricing [growth]";

- "revenue growth to be in high single-digit, somewhat higher on a percentage growth basis than 2012"; and

- "operating ratio [would] continue to improve given that [KCS was] starting from the base in the 60%s" and would "continue to improve during the years ahead."

65.    The market reacted positively to the news.  As reported by *Reuters* that evening, "Kansas City Southern's quarterly profit beat Wall Street estimates on strong intermodal and automotive volumes, and the U.S. railroad company forecast 2013 revenue growth in the high-single digits," and on this news, "[s]hares of Kansas City Southern, which have risen about 30 percent since the beginning of 2012, closed up nearly 5 percent at an all-time high of $91.67 on Tuesday [January 22, 2013]."

66.    On February 4, 2013, the Individual Defendants caused KCS to file its annual financial report on Form 10-K for the fiscal year ended December 31, 2012 with the SEC.  Each of the Director Defendants signed or authorized the signing of the Form 10-K.  The Form 10-K was also signed and certified under the Sarbanes-Oxley Act of 2002 by Defendants Starling and Upchurch.

67.    Concerning the exclusivity provided to the Company's use of tracks in Mexico by the KCS Concession, and the pricing power that purportedly provided the Company through 2027, the Form 10-K stated in pertinent part as follows:

> KCSM's rail lines provide exclusive rail access to the United States and Mexico border crossing at Nuevo Laredo, Tamaulipas, the largest rail freight interchange point between the United States and Mexico. Under the Concession, KCSM has the right to control and operate the southern half of the rail bridge at Laredo, Texas, which spans the Rio Grande River between the United States and Mexico. The Company also controls the northern half of this bridge through its ownership of Mexrail, Inc., ("Mexrail").

> KCSM provides exclusive rail access to the Port of Lazaro Cardenas on the Pacific Ocean. The Mexican government is developing the port at Lazaro Cardenas principally to serve Mexican markets and as an alternative to the U.S. west coast ports. KCSM is the sole provider of rail service to this port, which provides an alternate route for Asian and South American traffic bound for North America.

*        *        *

*The KCSM Concession.* KCSM holds a concession from the Mexican government until June 2047 (exclusive through 2027, subject to certain trackage and haulage rights granted to other concessionaires), which is renewable under certain conditions for an additional period of up to 50 years (the "Concession"). The Concession is to provide freight transportation services over rail lines which are a primary commercial corridor of the Mexican railroad system. These lines include the shortest, most direct rail passageway between Mexico City and Laredo, Texas and serve most of Mexico's principal industrial cities and three of its major shipping ports. KCSM has the right to use, but does not own, all track and buildings that are necessary for the rail lines' operation. KCSM is obligated to maintain the right of way, track structure, buildings and related maintenance facilities to the operational standards specified in the Concession agreement and to return the assets in that condition at the end of the Concession period. KCSM was required to pay the Mexican government a concession duty equal to 0.5% of gross revenues during the first 15 years of the Concession period, and on June 24, 2012, KCSM began paying 1.25% of such revenues, which is effective for the remaining years of the Concession period.

Under the Concession and Mexican law, the Company may freely set rates unless the Mexican government determines that there is no effective competition in Mexico's rail industry. KCSM is required to register its rates with the Mexican government and to provide railroad services to all users on a fair and non-discriminatory basis and in accordance with efficiency and safety standards approved periodically by the Mexican government. In the event that rates charged are higher than the registered rates, KCSM must reimburse customers with interest, and risk the revocation of the Concession.

Mexican Railroad Services Law and regulations and the Concession establish several circumstances under which the Concession will terminate: revocation by the Mexican government, statutory appropriation, or KCSM's voluntary surrender of its rights or liquidation or bankruptcy. The Concession requires the undertaking of capital projects, including those described in a business plan filed every five years with the Mexican government. KCSM submitted its five-year plan with the Mexican government in the fourth quarter of 2012 in which KCSM committed to certain minimum investment and capital improvement goals, which may be waived by the Mexican government upon application for relief for good cause. The Mexican government could also revoke KCSM's exclusivity after 2027 if it determines that there is insufficient competition.

The Concession is subject to early termination or revocation under certain circumstances. In the event that the Concession is revoked by the Mexican government, KCSM will receive no compensation. Rail lines and all other fixtures covered by the Concession, as well as all improvements made by KCSM or third parties, will revert to the Mexican government. All other property not covered by the Concession, including all locomotives and railcars otherwise acquired, will remain KCSM's property. In the event of early termination, or total or partial revocation, the Mexican government would have the right to cause KCSM to lease all service-related assets to it for a term of at least one year, automatically renewable for additional one-

year terms up to five years. The amount of the rent would be determined by experts appointed by KCSM and the Mexican government. The Mexican government must exercise this right within four months after early termination or revocation of the Concession. In addition, the Mexican government would have a right of first refusal with respect to certain transfers by KCSM of railroad equipment within 90 days after any revocation of the Concession. The Mexican government may also temporarily seize the rail lines and assets used in operating the rail lines in the event of a natural disaster, war, significant public disturbances, or imminent danger to the domestic peace or economy for the duration of any of the foregoing events; provided, however, that Mexican law requires that the Mexican government pay KCSM compensation equal to damages caused and losses suffered if it effects a statutory appropriation for reasons of the public interest. These payments may not be sufficient to compensate the Company for its losses and may not be made timely.

68.     On February 20, 2013, Galligan presented on behalf of KCS at the Barclays Capital Industrial Select Conference in New York City.

69.     During the presentation, Galligan emphasized that "one of [the] key operation areas" for KCS was "in [ ] Port Arthur, Texas, [in] the Gulf region of Texas," where "six of the largest 50 refineries in the world are located on our line there," stating the Company expected to see "tremendous crude by rail growth" there.

70.     Galligan also disclosed, for the first time, that "another thing that's going to ramp up probably, we're in very serious negotiations with a third party that has interest to build a crude facility on our property in Port Arthur, Texas," stating that "this would be a mixed-use facility, it could take heavy crude from Western Canada, it can take Bakken or a lighter crude, it can take refined products, it can even take ethanol products." Galligan further emphasized that the impact on the Company's revenues and earnings would be a "game changer," and that that impact could hit as early as 2014, stating in pertinent part as follows:

> We are – we kind of fit perfectly into the plans, because our facility, our land is right on the Gulf of Mexico. It's probably the largest plot of land still undeveloped on the Port of – in the middle of all these refineries. There are pipelines already running through it. There's rail access into it. It's a perfect facility.

If this facility is built, and I would say there's a pretty good likelihood that's going to happen, and probably sooner rather than later, that would take multiple unit trains a day of product. And that would be kind of a game changer again for Kansas City Southern in terms of its whole business profile. And, you know, it's theoretically possible you would start seeing that kind of huge growth in unit trains in 2014. It all depends on when we can finalize the deal.

So one way or another, it's going to grow substantially. We think there's a good chance that there's going to be a lot of growth in this facility.

71.     Then on February 28, 2013, the *Kansas City Business Journal* published a report entitled "KC Southern rides high on positive reports from Credit Suisse, Wells Fargo," stating in pertinent part:

Kansas City Southern stock is surging on a pair of positive reports from Credit Suisse Group AG and Wells Fargo.

The Kansas City based railroad company's (NYSE: KSU) stock hit a 52-week high on Wednesday's news, rising to as much as $107.3 a share from $99.60 during the day. On Thursday afternoon, the price sagged slightly to $104.01 a share, according to Yahoo Finance.

The Credit Suisse report, written by analyst Allison Landry, said the company is conducting "very serious negotiations" with an energy company about developing a crude oil terminal in Port Arthur, Texas, that would handle as many as five trains full of crude oil a day.

The new terminal would help KCS play a big role in moving heavy crude from Canada to the Gulf Coast and could increase the company's total carloads by as much as 8 percent, the report said. Moving the oil would generate significantly higher revenue for the firm than analysts initially estimated.

"We see substantial upside to our estimates should KSU ink a deal to construct the Port Arthur Crude Terminal," Landry said in the report, "with upwards of $1 in incremental earnings accretion by 2015."

The Wells Fargo report, written by analyst Anthony Gallo, said that the Port Arthur location is favorable because of its proximity to chemical plants and oil refineries on the Gulf Coast and that the deal would be "very beneficial" for the railroad company. The report also said Kansas City Southern owns around 500 acres in Port Arthur.

72.     The positive news sent the stock price climbing as it increased more than 6% between February 20, 2013 when it closed at $96.68 per share and February 27, 2013 when KCS stock closed at $103.13 per share.

73.     The Company's string of positive news releases, results and announcement of the "game changer" partnership paid off when on March 8, 2013, *The Wall Street Journal* reported that corporate debt rating agency "Standard & Poor's Ratings Services upgraded its ratings on Kansas City Southern (KSU) to investment grade, noting the regional railroad company's improving operating efficiency, disciplined debt reduction and lower interest expense," adding that "[t]he outlook is stable, reflecting expectations the company's revenues will benefit from modest pricing increases and growth in the Mexican economy will continue to enhance volumes."

74.     In a April 2, 2013 letter to KCS, following the filing of the Company's annual financial report for fiscal 2012 on Form 10-K, the SEC directed the Company to enhance its discussion of known trends impacting its financial results in future filings with the SEC to bring the Company's disclosures into compliance with the federal securities laws, stating in pertinent part as follows:

> We note your disclosures regarding the factors for which fluctuations in income statement line items are attributed; however, in addition to discussing the reasons for the change (or lack thereof), we believe you should also quantify the reasons for the change, particularly when more than one factor is attributed to the change. For example, you state that certain increases in revenues were "primarily" attributed to several factors, and "partially offset" by another factor. For a company with the size and breadth of operations as yours, these disclosures should be presented in a manner so as to allow investors to discern the relative contribution of each of the multiple components cited to the total change. Please revise to separately quantify each significant factor contributing to the change for each of the line items discussed within the results of operations section.

75.     On April 8, 2013, the Company responded promising to improve its disclosure of trends in future financial filings, stating in pertinent part as follows:

> In preparing Management's Discussion and Analysis of Financial Condition and Results of Operations (MD&A), the Company carefully considers the requirements of Item 303(a) of Regulation S-K and the related interpretive guidance in Section III. D of SEC Release 33-6835. The Company believes the disclosures included in the "Results of Operations" section of MD&A in its 2012 annual report on Form 10-K provide relevant quantitative information necessary for an understanding of its financial condition and results of operations, including a discussion of the causes of

material changes from year-to-year in financial statement line items "to the extent necessary to an understanding of the registrant's businesses as a whole."

*     *     *

While the Company believes its disclosures provide relevant quantitative information and comply with existing guidance, we have considered the Staff's comments, and in future filings, commencing with our quarterly report on Form 10-Q for the quarter ended March 31, 2013, we will include additional quantification where reasonable and practical.

76.     On April 17, 2013, Moody's, which already had rated KCSR's senior unsecured debt as investment grade, upgraded KCSM's senior unsecured debt to investment grade.

77.     Then, on April 19, 2013, before the opening of trading, the Individual Defendants caused KCS to issue a press release reporting its financial and operating results for the first quarter 2013 ended March 31, 2013, entitled "Kansas City Southern Reports Record First Quarter Revenues, Carloads, Operating Income and Operating Ratio." The press release noted that "[h]aving achieved investment grade ratings from the three major rating agencies, and with investment grade corporate borrowing costs remaining near all-time lows, KCS believes that it has an attractive opportunity to further reduce interest costs and lengthen the maturity of its debt portfolio."

78.     During a conference call held with investors and analysts later that day discussing the Company's financial condition, outlook, and how it was still on track to achieve – if not beat – the financial guidance issued on January 22, 2013, Starling further stated that the Company was "quickly putting [its] investment grade status to work." Upchurch further explained the positive impacts the higher investment ratings would have on the Company's capital structure and expenses going forward noting, in pertinent part, that "[o]verall we expect to lower our interest expense significantly from peak levels in 2009 and would expect the cumulative benefit to be somewhere between $0.10 and $0.15 when compared to 2012 earnings" and that the Company would "get some

offsetting benefits in OR, because of the reduced leases and provide some further updates in guidance once we complete these transactions."

79.     During the same call, Ottensmeyer confirmed the Company's earlier comments about the ongoing negotiations to expand the Port Arthur crude oil terminal and specifically referenced the analyst chatter regarding the earlier announcement noting, in pertinent part:

> I wanted to take a moment to bring everyone up-to-date on the status of our negotiations regarding the possible development of a crude oil terminal in Port Arthur, Texas. We've seen heightened discussion in the analyst community, and we just wanted to make sure everyone understands what we are up to.
>
> We are currently in negotiations with a potential partner to develop a unit train, unloading and storage terminal on property that KCS owns in Port Arthur. That property is highlighted in red on this map. We are not in a position to identify our partner or discuss details regarding timing, volumes or revenues. So please don't ask questions.
>
> What we will discuss are the reasons we are so optimistic about this potential opportunity and what gives KCS a seat at the crude oil table. As you can see on this slide, Port Arthur refineries import about 1.7 million barrels of crude oil each day. Because many of the refineries have also invested in coking capacity, there is a natural draw for heavy crude like that produced in Western Canada.
>
> Even if or when the Keystone pipeline is completed, we believe it will be able to handle only about half of this demand.
>
> The current rail terminal unloading capacity can handle less than 3% of this demand.
>
> As I said earlier, we are in negotiations with a potential partner, and we hope to be able announce a transaction very soon. However, if for whatever reason we don't come to terms with this group, we are confident that other options would be available for us to capitalize on this market opportunity.

80.     The news of the day sent the price of KCS stock up more than $3 per share from its close of $102.78 per share on April 18, 2013, to close at $105.85 per share on April 19, 2013.

81.     On April 22, 2013, the Individual Defendants caused the Company to file its quarterly financial report on Form 10-Q with the SEC for the quarter ended March 30, 2013. Concerning the exclusivity provided to the Company's use of tracks in Mexico by the KCS Concession, and the

pricing power that purportedly provided the Company through 2027, the Form 10-Q stated in pertinent part that "[u]nder KCSM's 50-year railroad concession from the Mexican government…, KCSM paid concession duty expense of 0.5% of gross revenues for the first 15 years of the Concession period and, on June 24, 2012, KCSM began paying 1.25% of gross revenues, which is effective for the remaining years of the Concession," and that "[f]or the three months ended March 31, 2013, the concession duty expense, which is recorded within materials and other in operating expenses, was $3.4 million, compared to $1.3 million for the same period in 2012."

82.     On July 19, 2013, the Individual Defendants caused the Company to file its quarterly financial report on Form 10-Q with the SEC for the quarter ended June 30, 2013.  Concerning the exclusivity provided to the Company's use of tracks in Mexico by the KCS Concession, and the pricing power that purportedly provided the Company through 2027, the Form 10-Q stated in pertinent part that "[u]nder KCSM's 50-year railroad concession from the Mexican government…, KCSM paid concession duty expense of 0.5% of gross revenues for the first 15 years of the Concession period and, on June 24, 2012, KCSM began paying 1.25% of gross revenues, which is effective for the remaining years of the Concession," and that "[f]or the three and six months ended June 30, 2013, the concession duty expense, which is recorded within materials and other in operating expenses, was $3.4 million and $6.8 million, respectively, compared to $1.4 million and $2.7 million for the same periods in 2012."

83.     On October 18, 2013, before the opening of trading, the Individual Defendants caused KCS to issue a press release touting record revenues and carloads during the third quarter 2013 ended September 30, 2013 which, according to the release, were "driven by strong cross-border revenue growth."   The release emphasized that the Company had achieved "[r]evenues of $622 million, an increase of 8% over third quarter 2012 on a 3% increase in carloads," "[o]perating

income of $200 million, 11% higher than operating income in third quarter 2012," "[o]perating ratio of 67.8%, a 0.9 point improvement over the operating ratio in third quarter 2012," "[d]iluted earnings per share of $1.07 compared with diluted earnings per share of $0.82 in third quarter 2012," and that "[a]djusted diluted earnings per share of $1.10 for third quarter 2013 increased 16% over adjusted diluted earnings per share of $0.95 in the third quarter 2012."

84.     The release continued, quoting Starling, who stated, in pertinent part:

Kansas City Southern achieved record revenues and carloads as a result of solid, sustainable growth opportunities and strong execution by our team.   This performance demonstrates KCS' ability to absorb the impacts of a challenging economic environment while consistently delivering strong top-line and bottom-line results.

The fact that KCS delivered revenue growth in all of its business units speaks to the strength and diversity of this franchise. In addition to the many exciting growth opportunities that we see on the horizon from Intermodal, Auto and Energy, KCS' core carload franchise continues to deliver solid revenue performance and contribution to our overall growth in earnings. Particularly exciting is the fact that our cross-border revenue grew by 16% in the quarter. In addition to continued strength in cross-border intermodal, cross-border revenue also benefited from strength in steel shipments and an early rebound in export grain.

85.     With respect to the Company's Operating Ratio, the release specifically noted that while "[o]perating expenses for the third quarter were $421 million, 6% higher than the corresponding 2012 period" and "[o]perating income for the third quarter of 2013 was $200 million, 11% higher than 2012 operating income," the Company actually "reported a third quarter 2013 operating ratio of 67.8%, a 0.9 point improvement over the 2012 operating ratio."

86.     In the release, Starling also addressed the Company's forward financial guidance, and in doing so underscored the purported continuing improvement in the Company's Operating Ratio, stating in pertinent part:

Looking ahead, we expect a strong end to the year benefited by growth in export grain shipments. We also look forward to long-term improvement in our operating ratio as we move forward with our plan to increase the percentage of equipment we own versus lease.

87.     Later in the day on October 18, 2013, and following the issuance of the Company's 2013 third quarter financial results, Starling, Ebbrecht, Ottensmeyer, and Upchurch participated in a conference call with investors and analysts. During the call, additional, positive statements were made by Starling, Ebbrecht, Ottensmeyer, and Upchurch regarding the Company's financial condition, its outlook and how it was still on track to achieve if not beat the financial guidance issued on January 22, 2013.

88.     Specifically, they stated despite that "fourth quarter for utility coal [would] look a little bit worse than last year" and the "full year 2013 [would] be a little worse than all of 2012 for utility coal," "growth in frac sand and crude oil [would] still push the Energy business unit overall into positive single-digit territory." These Defendants also stated the Company was "still expecting double-digit growth in Automotive for 2013 in spite of a drop in growth rates during the third quarter," as it would "begin to see some activity from the new Nissan plant in December," "[a]nd the Honda and Mazda plants [were] opening in the Salaya area in the first quarter of 2014." Further, Defendant Starling emphasized that "you could be assured that we'll maintain stringent control of our operating costs, which will further enhance profitability," and "remain[ed] very bullish on the opportunities [the Company's] franchise provides for the next several years and beyond."

89.     Also on October 18, 2013, the Individual Defendants caused the Company to file its quarterly financial report on Form 10-Q with the SEC for the quarter ended September 30, 2013. Concerning the exclusivity provided to the Company's use of tracks in Mexico by the KCS Concession, and the pricing power that purportedly provided the Company through 2027, the Form 10-Q stated in pertinent part that "[u]nder KCSM's 50-year railroad concession from the Mexican government…, KCSM paid concession duty expense of 0.5% of gross revenues for the first 15 years of the Concession period and, on June 24, 2012, KCSM began paying 1.25% of gross revenues,

which is effective for the remaining years of the Concession," and that "[f]or the three and nine months ended September 30, 2013, the concession duty expense, which is recorded within materials and other in operating expenses, was $3.7 million and $10.5 million, respectively, compared to $3.5 million and $6.2 million for the same periods in 2012."

90.     Finally, on October 18, 2013, *Reuters* reported that because the Company "gets almost half of its revenue from Mexico," the "strength of its cross-border business has placed Kansas City Southern in a better position than most U.S. railroads, whose heavy dependence on coal shipments has hurt them since early 2012 as demand for the fuel has slumped."  *Reuters* also confirmed that the Company "said it expects a strong end to the year as cross-border business grew." Cross-border shipments were expected to ramp-up particularly in auto as early as the 2014 first quarter, with several auto manufacturers scheduled to bring new plants on line in Mexico.

91.     The positive statements on October 18, 2013, again sent KCS shares soaring as the stock price climbed more than $4 per share to close at $117.15 on October 18, 2013.  That upward trend continued as the false and misleading statements remained uncorrected with KCS common stock reaching a bloated $125.96 per share in intraday trading on November 14, 2013.

92.     Looking to capitalize on the artificially inflated stock price, on October 24, 2013, the Individual Defendants caused the Company to announce that its two wholly-owned operating subsidiaries – KCSR and KCSM – were raising hundreds of millions of dollars in private debt placements not registered under the Securities Act of 1933.  Specifically:

- KCSR priced and sold $200 million aggregate principal amount of its 3.85% Senior Notes due 2023, saying it would use the net proceeds to finance the purchase of certain leased equipment, pay any early lease termination charges related thereto,

finance the purchase of new equipment to replace certain leased equipment under expiring leases, and to pay fees and expenses related to the offering; and

- KCSM priced and sold $250 million aggregate principal amount of its Floating Rate Senior Notes due 2016, saying it would use the net proceeds to redeem certain of its senior notes due in 2018 and 2021, finance the purchase of certain leased equipment, pay any early lease termination charges related thereto, finance the purchase of new equipment to replace certain leased equipment under expiring leases, and pay fees and expenses related to the offering.

93.     On October 24, 2013, and expressly relying on Defendants' false but positive statements on October 18, 2013, Moody's assigned a rating of Baa3 and Fitch assigned a rating of BBB- to the new senior notes offered by KCSR and KCSM.

94.     In its release issued that day, Moody's reiterated, as to its "Ratings Rationale," that "[t]he majority of the proceeds from these notes will be used to finance the buy-out of equipment leases and to finance the replacement of equipment with near-term lease expirations."  The release further emphasized that "Moody's anticipates that the economic benefits of the lease buy-outs would offset any such increase in leverage as the company is expected to focus on NPV positive transactions that result in increased profits and operating cash flow," and that "[t]he stable rating outlook for KCS and its subsidiaries reflects Moody's expectations that the company's operations will be able to maintain solid operating margins while experiencing single-digit revenue growth over the near term."

95.     Similarly, in its release issued that day, Fitch reiterated that "[p]roceeds from the issuance [would] largely be used to purchase rolling stock that [was] currently under operating lease,

or to acquire new equipment that [would] replace equipment under leases set to expire in the near term," adding that:

> The 'BBB-' ratings for KSU and its primary operating subsidiaries are supported by the company's solid operating margins, steadily increasing revenues, moderate leverage, and positive free cash flow (FCF). Fitch expects the company to continue to produce healthy operating results in the near to intermediate term driven by a growing cross-border business, an improving automotive market, and expectations for a rebound in grain shipments after the weak harvest in 2012. Fitch notes that the health of KCS's balance sheet has improved after the company completed a major refinancing of much of its remaining high yield debt in the first half of 2013.

96.    Indeed, as is detailed above, the Individual Defendants caused the Company to issue statements that misrepresented and/or failed to disclose the following adverse facts, which were known to the Individual Defendants or recklessly disregarded by them:

(a)    Mexican government officials were privately clamoring to curtail the exclusivity provided to KCS in Mexico rail way shipping under the KCS Concession because the Mexican government claimed the exclusivity caused KCS to invest less into rail way capital and to charge higher shipping prices in Mexico than the market would otherwise provide for absent the KCS Concession;

(b)    KCS's utility coal volumes declined more drastically than Defendants led the market to anticipate;

(c)    KCS's crude oil shipments declined more significantly than Defendants led the market to anticipate;

(d)    Carloads in the Company's Chemical & Petroleum shipments to Mexico declined due to operational issues with the Company's customers in Mexico;

(e)    The Company's anticipated ramp-up of its Mexican auto shipment business was not advancing at the rate the market was led to believe as the new plants were not coming on line and there would be a negligible benefit to the Company's revenues and profits in 2014;

(f)     The Company's heavily touted efforts to build the Port Arthur crude oil terminal were riddled with operational difficulties pushing the positive financial benefits of the expansion effort off further into the future; and

(g)     Based on the foregoing, the Individual Defendants lacked a reasonable basis for causing the Company to issue positive statements about the Company's "strong" business performance during that time.

97.     On January 24, 2014, the Individual Defendants caused KCS to issue a press release announcing its 2013 fourth quarter and fiscal financial results for the period ended December 30, 2013.  The Company reported 2013 fourth quarter net income of $113.8 million, or $1.03 per share, on revenues of $615.6 million, significantly missing the net income of $1.10 per share on revenues of $618.1 million the investment community had been led to expect based on the Company's previous bullish statements.  For fiscal 2013, net income fell to $3.98 per share, significantly missing the $4.05 per share the investment community had been led to expect based on similarly bullish statements.

98.     Where the Company's Operating Ratio had decreased to 67.8% for the 2013 third quarter, and where the market had been led to believe on October 18, 2013, that it was continuing to decline, the Company's Operating Ratio actually increased in the 2013 fourth quarter to 68.1% – a 0.3 point increase.

99.     During a call with investors that followed the Company's disappointing earnings release, displaying a "final scorecard in how [KCS] performed versus [its] guidance," Starling noted that "[i]n terms of volume," despite a forecast of "mid single-digit growth," "[w]ith [the Company's] reported 2% growth for the year, [it had] obviously came in below that guidance."

100.    It was also disclosed that:

(a) KCS's Energy business actually declined 17% in the 2013 fourth quarter, with the Company's utility coal volumes the lowest for any quarter since the beginning of 2006 due to "the earlier than expected seasonal shutdown at one plant [the Company] serve[s] in Texas, unplanned outages for 1 month at another plant [it] serve[s] in Louisiana, and reduced shipments to a third plant that [it] serve[s] due to derating in anticipation of permanently shutting down one generating unit there by the end of 2015."

(b) "Crude oil shipments declined by 8% during the quarter, … the first time in a couple of years that [Defendants had] seen decline in this business," with "[s]ome of the factors driving this decline include[ing] shifting supply pattern among refiners, more light sweet crude coming into [its] service region by pipeline and water, … a shift in the destination for Bakken crude away from the Gulf and more toward the eastern refineries," and "increased pipeline capacity and limited storage availability at one of the terminals [the Company] serve[d] in the Port Arthur area."

(c) Carloads in the Company's Chemical & Petroleum business declined by 4% in the 2013 fourth quarter due to weakness in petroleum shipments in Mexico attributable entirely to large customers, with one suffering a "residual impact of flooding in Southern Mexico earlier in the quarter in October as well as some terminal congestion on the part of [the] customer, which reduced the level of shipments," and the second, a "utility customer, again in Mexico, which shifted its power generation away from fuel oil to hydroelectric and natural gas."

(d) As to the previously promised increases in the Company's Automotive business, "[t]he ramp-up in production at the [Company's] new auto plants [in Mexico would] occur over a bit longer period of time than [anticipated] a year ago," causing "a ripple effect on other products like steel and plastics" "and those other commodities that [the Company] move[s] that are connected to auto plants" during 2014.

(e)     Operating expenses increased 6% in the fourth quarter 2013 which included year-over-year increases in compensation and benefit expenses due to increased headcount and purchased services such as track repairs and trackage rights impacting Operating Ratio.

101.    The Company also offered a disappointing earnings growth outlook for fiscal 2014, forecasting per-share earnings for 2014 to rise only in the mid-teens, while the investment community had been led to expect 26% growth to $5.02 per share in earnings based on the bullish statements the Individual Defendants caused the Company to make several months earlier.

102.    Indeed, the Company's dour news *was not* an industry-wide trend:  Both Norfolk Southern Corp. and Union Pacific Corp. announced stronger-than-expected results in the days preceding the Company's earnings release.

103.    In response to the Company's announcement, on January 24, 2014, the price of KCS common stock declined a staggering $17.79 per share – more than 15% – from its close of $117.28 per share on January 23, 2014 to close below $100 per share.

104.    In all, the price of KCS common stock declined *more than $26 per share* from its high of $125.96 per share on November 14, 2013, *erasing a whopping $2.9 billion in market capitalization.*

105.    In its report downgrading KCS's stock valuation from $135 per share to $109 per share on January 27, 2014, Raymond James & Associates, Inc. confirmed that "Kansas City Southern's commentary largely reset earnings expectations to more achievable levels in addition to lowering valuation."

106.    Then, on February 18, 2014, the market learned that the lower house of the Mexican legislature had approved a new bill to increase rail competition in Mexico.  The legislation, if it

passed Mexico's Senate, would give third-party companies access to KCS's now-exclusive freight

and passenger rail networks.

107.    *The Wall Street Journal*, in a February 19, 2014 report entitled "Railroads and

Mexican Government on Collision Course: Kansas City Southern and Grupo Mexico Fight Bill That

Would Strip Exclusive Track Rights," explained that:

> A bill to open the rails to new passenger and freight operators has passed Mexico's lower house of Congress and could be voted on in the Senate before the end of April. The measure's sponsors say the rail duopoly has led to low investment and high freight prices.
>
> The railroads say the legislation would nullify 30-year exclusive licenses they purchased 17 years ago and create congestion on the tracks. The new law also would place the burden of maintaining rail crossings on the companies, rather than the federal government, potentially opening the companies to liability claims if accidents occur, the railroads say.
>
> The legislation was expected to have been a point of discussion during U.S. President Barack Obama's meeting here Wednesday with Mexican President Enrique Peña Nieto.
>
> The effort to open up the rails follows Mr. Peña Nieto's drive to increase competition in such industries as banking, energy and telecommunications. On Wednesday he proposed a law that would give antitrust authorities greater powers to ensure competition.
>
> Mexico's continued role as a global manufacturing powerhouse depends in part on its ability to move cars and other goods out of the country quickly by rail.
>
> Mr. Peña Nieto also plans to boost the country's modest passenger railway network by auctioning off licenses in the coming months to lay track in central and southeastern Mexico. The state of Quintano Roo, home to beach destinations such as Cancún, has no rail infrastructure, for example.
>
> The Mexican rail system was privatized in the late 1990s by then-president Ernesto Zedillo, who served on the Union Pacific board for five years after his presidency. The bill Mexico's Congress seeks would partially reverse that privatization by forcing Ferromex and Kansas City Southern de México to open their rails to other operators at fees regulated by the government.
>
> *        *        *
>
> Kansas City Southern has called in the big guns in an attempt to stymie the rail legislation.

Patrick Ottensmeyer, Kansas City Southern's executive vice president and chief marketing officer, told investors at a conference last week that U.S. Commerce Secretary Penny Pritzker addressed the company's concerns when she met with senior Mexican officials recently. The Commerce Department confirmed that the measure was a topic of conversation. The company hopes that intensive lobbying can kill, or at least soften, the legislation.

"We're using every available channel to make sure our interests are protected, and at the end of the day, we don't think this will be a threat to our franchise there," Mr. Ottensmeyer says.

The legislation says insufficient investment has stalled expansion of the rail system, which has carried a quarter of the country's freight since 2006, while prices have more than quadrupled. Rail handles 42% of all cargo transported in the U.S. and 64% of that in Canada. The high concentration of cargo that traverses Mexico by truck clogs and damages roads and poses a threat to public safety and the cargo itself, according to the bill's sponsors.

"It's intolerable that in recent years they have only built [25 miles] of railway. This is why we have to get more competition in a sector dominated by two companies," says Manlio Fabio Beltrones, head of the ruling PRI party in Mexico's lower house of Congress.

108. Thus, the Mexican government had long been dissatisfied with KCS's performance under the KCS Concession. The Individual Defendants either knew or should have known of that discontentment and the risk it posed to the profits from the Company's Mexican operations, yet they failed to disclose this information to the market.

109. On this news, the price of KCS stock plummeted further, closing down more than $4 per share on February 18, 2014 to close at $91.67 per share from its previous trading day's closing price on February 14, 2014 of $95.96.

110. Indeed, *The Economist* reported on March 14, 2014 that:

The bill's authors had President Enrique Peña Nieto's backing. Rail bosses say he was talked into supporting it by steelmakers, whose trade body, the National Steel Chamber, is headed by a friend of the president, Alonso Ancira. The Chamber says that the rail costs of shipping steel through Mexico are 57% more than in the United States, which it blames on a lack of competition. The lower-house bill set out to fix that with three new impositions on the concession-holders: regulation of their tariffs where necessary; a requirement to offer smooth interchanges between their networks;

and freedom for new competitors to use their lines, even though they would not have to invest in their upkeep.

## DUTIES OF THE INDIVIDUAL DEFENDANTS

### Fiduciary Duties

111.    By reason of their positions as officers, directors, and/or fiduciaries of KCS and because of their ability to control the business and corporate affairs of KCS, the Individual Defendants owed and owe the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage KCS in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of KCS and its shareholders so as to benefit all shareholders equally and not in furtherance of their personal interest or benefit.

112.    Each director and officer of the Company owes to KCS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing. In addition, as officers and/or directors of a publicly held company, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock would be based on truthful and accurate information.

### Audit Committee Duties

113.    At all times relevant hereto, the members of the Audit Committee were Druten (Chairman), Cordova, and McDonnell.

114.    In addition to the duties owed by them as Board members, the members of the Audit Committee owed specific duties to KCS under the Audit Committee's Charter to review and approve quarterly and annual financial statements, earnings press releases, and to ensure that the Company

had appropriate and effective internal controls over financial reporting. In particular, KCS's Audit Committee Charter states as follows:

I.      PURPOSE

The Audit Committee's primary purposes are to:

• Monitor the quality and integrity of the Company's financial reporting process, financial statements and systems of internal controls.

• Monitor the independence, qualifications and performance of the Company's independent registered public accounting firm (the "Independent Auditor") selected as the Company's auditor and the internal audit department.

• Provide an avenue of communication among the Company's Independent Auditor, management, the internal auditing department and the Board.

• Monitor compliance with legal and regulatory requirements.

• Review areas of potential significant financial risk to the Company and oversee the management's enterprise risk management program.

• Prepare the required report for inclusion in the Company's annual meeting proxy statement, and recommend to the Board whether the Company's audited financial statements be included in its annual report on Form 10-K.

                          *       *       *

V. DUTIES AND RESPONSIBILITIES

Review Procedures

1. Review and reassess the adequacy of this Charter at least annually. Submit any proposed changes to the Board.

2. Review with management and the Company's Independent Auditor the annual audited financial statements and quarterly financial statements of the Company and any subsidiary of the Company required to file periodic reports with the SEC (each, a "Reporting Subsidiary"), including the Company's and any Reporting Subsidiary's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations." Review and discuss with management and the Independent Auditor the results of the Independent Auditor's assessment of management's report on internal controls prior to the filing of the Company's Form 10-K.

3. Review and discuss earnings press releases, as well as financial information and, if any, earnings guidance provided to analysts and rating agencies. This review may be general in nature and need not be in advance of each release. The Chairperson of the Committee may represent the entire Committee for purposes of these reviews.

4. In consultation with management, the Company's Independent Auditor and the internal auditors, consider the integrity of the Company's financial reporting processes and internal controls. Review significant findings prepared by the Company's Independent Auditor and the internal audit department together with management's responses, including any significant deficiencies or material weaknesses, the status of previous recommendations and any special audit steps adopted in light of any material control deficiencies.

5. Discuss with management, the internal audit department and the Company's Independent Auditor, the Company's risk assessment and risk management policies, including the Company's major financial risk exposure and steps taken by management to monitor and mitigate such exposure.

6. Review with financial management and the Company's Independent Auditor the financial results of the Company and any Reporting Subsidiary prior to the filing of the Form 10-Q or 10-K of the Company or such Reporting Subsidiary. Discuss any significant changes to accounting principles and the disclosures made by the CEO and CFO during the certification process. The Chairperson of the Committee may represent the entire Committee for purposes of these reviews in the event the full Committee is unable to review such information prior to filing.

\*   \*   \*

Internal Audit Department

14. Review the proposed internal audit plan, changes in plan, activities, organization structure, staffing, qualifications and activities of the internal audit department. The internal audit department shall be responsible to senior management, but have a direct reporting responsibility to the Board through the Committee.

15. Review the appointment, performance and replacement of the senior internal audit executive.

16. Review significant reports prepared by the internal audit department together with management's response and follow-up to these reports.

**Code of Business Conduct**

115.    As officers and/or directors of KCS, the Individual Defendants had a duty to

"compl[y] with the highest ethical standards in pursuing [KCS's] business interests."  Further, the

Individual Defendants were obligated to, but failed to, "fulfill this commitment in order to protect the Company from criticism and litigation and to preserve and enhance the Company's reputation as a good corporate citizen."

116.　KCS's Code of Business Conduct also states, in relevant part, that "[t]he Company's periodic reports and other documents filed with the SEC, including all financial statements and other financial information, must comply with applicable federal securities laws and SEC rules.  Each director, officer and employee who contributes in any way to the preparation or verification of the Company's financial statements and other financial information must ensure that the Company's books, records and accounts are accurately maintained.

117.　Further, the Code of Business Conduct mandates that:

Each director, officer and employee who is involved in the Company's disclosure process must:

  (a)　be familiar with and comply with the Company's disclosure controls and procedures and its internal control over financial reporting; and

  (b)　take all necessary steps to ensure that all filings with the SEC and all other public communications about the financial and business condition of the Company provide full, fair, accurate, timely and understandable disclosure.

118.　As is described throughout this Complaint, the Individual Defendants failed to live up to, among other things, the Company's Code of Business Conduct, causing harm to the Company and its shareholders.

**Control, Access, and Authority**

119.　The Individual Defendants, because of their positions of control and authority as directors and/or officers of KCS, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by KCS.

120.     Because of their advisory, executive, managerial, and directorial positions with KCS, each of the Individual Defendants had access to adverse, non-public information about the financial condition, operations, and improper representations of KCS.

121.     At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and of KCS, and was at all times acting within the course and scope of such agency.

**Reasonable and Prudent Supervision**

122.     To discharge their duties, the officers and directors of KCS were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the financial affairs of the Company.  By virtue of such duties, the officers and directors of KCS were required to, among other things:

(a)     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, and to maximize the value of the Company's stock;

(c)     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results;

(d)     remain informed as to how KCS conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in

connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with securities laws; and

(e)      ensure that KCS was operated in a diligent, honest, and prudent manner in compliance with all applicable laws, rules, and regulations.

**BREACHES OF DUTIES**

123.      Each Individual Defendant, by virtue of his or her position as a director and/or officer, owed to KCS and to its shareholders the fiduciary duty of loyalty and good faith and the exercise of due care and diligence in the management and administration of the affairs of KCS, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of KCS, the absence of good faith on their part, and a reckless disregard for their duties to KCS and its shareholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to KCS.

124.      The Individual Defendants each breached their duty of loyalty and good faith by allowing, by themselves causing, or by their inaction allowing the Company to make false and/or misleading statements that materially overstated KCS's true financial health and business prospects. In addition, as a result of the Individual Defendants' illegal actions and course of conduct, the Company is now the subject of the Securities Class Action alleging violations of the federal securities laws.  As a result, KCS has expended, and will continue to expend, significant sums of money to rectify the Individual Defendants' wrongdoing.

**CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION**

125.      In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and

conspired with one another in furtherance of their wrongdoing. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

126. During all times relevant hereto, the Individual Defendants collectively and individually initiated a course of conduct that was designed to mislead shareholders into believing that KCS had adequate liquidity to operate effectively through the end of 2013. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein.

127. The purpose and effect of the Individual Defendants' conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (a) disguise the Individual Defendants' violations of law, including breaches of fiduciary duty and unjust enrichment; and (b) disguise and misrepresent the Company's future business prospects.

128. The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company to purposefully, recklessly, or negligently release improper statements. Because the actions described herein occurred under the authority of the Board, each of the Individual Defendants was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

129. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commissions of the wrongdoing complained of herein, each Individual Defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing, and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## DAMAGES TO KCS

130.    At all times relevant hereto, the Individual Defendants, as senior executive officers and/or directors of KCS, were privy to confidential and proprietary information concerning KCS, its operations, finances, financial condition and present and future business prospects. Because of their positions with KCS, the Individual Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

131.    As a result of the Individual Defendants' wrongful conduct, KCS disseminated false and misleading statements. The improper statements have devastated KCS's credibility. Indeed, the Company is now the subject of the Securities Class Action and the Company will now face substantial costs in connection with that lawsuit.

132.    As a direct and proximate result of the Individual Defendants' actions as alleged above, KCS's market capitalization has been substantially damaged.

133.    Further, as a direct and proximate result of the Individual Defendants' conduct, KCS has expended and will continue to expend significant sums of money. Such expenditures include, but are not limited to:

(a)     costs incurred in investigating and defending KCS and certain officers in the Securities Class Action, plus potentially hundreds of millions of dollars in settlement or to satisfy an adverse judgment;

(b)      costs incurred from compensation and benefits paid to the Individual Defendants, which compensation was based at least in part on KCS's artificially-inflated stock price and inflated revenues; and

(c)      costs incurred from the loss of the Company's customers' confidence in KCS's services.

134.    Moreover, these actions have irreparably damaged KCS's corporate image and goodwill. For at least the foreseeable future, KCS will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that KCS's ability to raise equity capital or debt on favorable terms in the future is now impaired.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

135.    Plaintiff brings this action derivatively in the right and for the benefit of KCS to redress injuries suffered, and to be suffered, by KCS as a direct result of the Individual Defendants' breaches of fiduciary duty and unjust enrichment. KCS is named as a nominal defendant solely in a derivative capacity.

136.    This is not a collusive action to confer jurisdiction on this Court that it otherwise would not have.

137.    Plaintiff will adequately and fairly represent the interests of KCS in enforcing and prosecuting its rights.

138.    Plaintiff was a shareholder of KCS common stock at the time of the wrongdoing of which Plaintiff complains and has been continuously since.

139.    Plaintiff did not make a pre-suit demand on the Board to pursue this action, because such a demand would have been a futile and wasteful act.

140.    The Board currently consists of the following nine Individual Defendants:  Starling, Cordova, Davis, Druten, Dunn, Garza, Haverty, McDonnell, and Slater.

**Demand Is Futile As To Defendant Starling**

141.    Starling faces a substantial likelihood of liability for his individual misconduct. Starling is also a named a defendant in the Securities Class Action alleging that he, along with certain of the other Individual Defendants and the Company, violated §10(b) of the Securities Exchange Act of 1934 and Rule 10b-5 when he disseminated or approved materially false and misleading statements.

142.    If Starling pursued these derivative claims, then that would expose his own misconduct in the Securities Class Action for violations of the federal securities laws.  This, in turn, would impair the defense of the Securities Class Action and greatly increase the probability of Starling's personal liability in the Securities Class Action.  As such, Starling is fatally conflicted, and therefore, unable to render a disinterested decision as to whether the Company should pursue these derivative claims.  Thus, demand is futile as to Starling.

143.    Additionally, Starling is interested because he issued many of the false and misleading statements.  Starling therefore faces a substantial likelihood of liability for breaching his fiduciary duties to KCS shareholders.  Consequently, Starling cannot disinterestedly consider a demand.

144.    Finally, Starling cannot render an independent decision because he is and was a high-ranking officer of KCS during the time period when the wrongdoing occurred.  Starling has served as the CEO of KCS since August 2010.  According to the Company, Starling is not an independent director.  Thus, Starling is a current Company insider and therefore cannot independently consider a demand.

**Demand Is Futile As To Defendant Haverty**

145.     Haverty currently serves as Executive Chairman of KCS's Board.

146.     According to the Company's most recent Notice and Proxy Statement, dated March 31, 2014, Haverty is not an independent director due to his recent employment with the Company.

147.     Specifically, until September 30, 2013, Haverty served as Executive Chairman of the Board and was considered an employee of KCS during that time.  As such, Haverty is not an independent director and cannot render an independent decision with respect to pursuing an action based on the matters alleged herein.  Thus, Haverty cannot independently consider a demand.

**Demand Is Futile As To The Audit Committee Defendants**

148.     Cordova, Druten, and McDonnell, as Audit Committee members, were responsible for reviewing and approving quarterly and annual financial statements, earnings press releases, and KCS's internal controls over financial reporting.   Despite these duties, the Audit Committee Defendants knowingly and/or recklessly reviewed and approved false financial statements and press releases.  In particular, the Audit Committee Defendants knew or should have known that:

- the Company's exclusivity agreement with Mexico for railway shipping was in jeopardy;

- KCS's utility coal volumes and crude oil shipments were declining more significantly than the market was led to anticipate;

- the Port Arthur crude oil terminal "game changer" partnership which was much bragged about by the Company was riddled with operational difficulties pushing anticipated financial benefits off further than the market was led to expect;

- the Company's Chemical & Petroleum shipments to Mexico had declined due to operational issues with the Company's customers in Mexico;

the anticipated increase in KCS's Mexican auto shipment business was not materializing to the extent the market was led to believe as the new plants were not coming on line making the financial benefit for 2014 negligible; and

- as such, there was no reasonable basis for positive statements about the Company's "strong" business performance at the time those statements were made.

149. Accordingly, the Audit Committee Defendants face a sufficiently substantial likelihood of liability for breach of their fiduciary duties of loyalty and good faith. Any demand upon the Audit Committee Defendants therefore is futile.

## **Demand Is Futile As To All Director Defendants For Additional Reasons**

150. If KCS's current officers and directors are protected against personal liability for their acts of mismanagement, abuse of control, and breaches of fiduciary duties alleged in this Complaint by Directors and Officers Liability Insurance ("D&O Insurance"), they caused the Company to purchase that insurance for their protection with corporate funds, *i.e.*, monies belonging to the shareholders. However, Plaintiff is informed and believes that the D&O Insurance policies covering the Individual Defendants in this case contain provisions that eliminate coverage for any action brought directly by KCS against the Individual Defendants, known as the "insured versus insured exclusion." As a result, if the Director Defendants were to sue themselves or certain of the officers of KCS, there would be no D&O Insurance protection, and thus, this is a further reason why they will not bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage exists and will provide a basis for the Company to effectuate recovery. Therefore, the Director Defendants cannot be expected to file the claims asserted in this derivative lawsuit because such claims would not be covered under the Company's D&O Insurance policy.

151.     Under the factual circumstances described herein, the Director Defendants are more interested in protecting themselves than they are in protecting KCS by prosecuting this action. Therefore, demand on KCS and its Board is futile and is excused.

152.     KCS has been and will continue to be exposed to significant losses due to the Individual Defendants' wrongdoing.  Yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct.  Thus, the Director Defendants are breaching their fiduciary duties to the Company and face a sufficiently substantial likelihood of liability for their breaches, rendering any demand upon them futile.

## COUNT I

### Against The Individual Defendants For Breach Of Fiduciary Duty

153.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

154.     The Individual Defendants owed and owe KCS fiduciary obligations.  By reason of their fiduciary relationships, the Individual Defendants owed and owe KCS the highest obligation of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

155.     The Individual Defendants violated and breached their fiduciary duties of good faith, fair dealing, loyalty, due care, reasonable inquiry, oversight and supervision.

156.     The Individual Defendants each knowingly, recklessly or negligently approved the issuance of false statements that misrepresented and failed to disclose material information concerning the Company.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

157.     As a direct and proximate result of the Individual Defendants' failure to perform their fiduciary obligations, KCS has sustained significant damages.  As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

158.     Plaintiff, on behalf of KCS, has no adequate remedy at law.

## COUNT II

### Against The Individual Defendants For Waste Of Corporate Assets

159.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

160.     The Individual Defendants wasted corporate assets by paying improper compensation and bonuses to the executive officers and directors that breached their fiduciary duty, exposing the Company to liability, and causing it to incur potentially millions of dollars in legal costs.

161.     As a result of the Individual Defendants' waste of corporate assets, the Individual Defendants are liable to the Company.

162.     As a direct and proximate result of the Individual Defendants' actions described herein, the Company has suffered significant damages, as alleged herein.

163.     Plaintiff, on behalf of KCS, has no adequate remedy at law.

## COUNT III

### Against The Individual Defendants For Unjust Enrichment

164.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

165.     By their wrongful acts and omissions, the Individual Defendants were unjustly enriched at the expense of and to the detriment of KCS.

166.     Each Individual Defendant was unjustly enriched as a result of substantial incentive-based compensation they received while breaching his fiduciary duties owed to KCS.

167.     Plaintiff, as a shareholder and representative of KCS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, benefits, and other compensation obtained by the Individual Defendants from their wrongful conduct and fiduciary breaches.

168.     Plaintiff, on behalf of KCS, has no adequate remedy at law.

## COUNT IV

### Against The Individual Defendants For Aiding And Abetting Fiduciary Violations

169.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

170.     The wrongful conduct alleged herein was continuous, connected, and on-going since January 2013.  The Individual Defendants' misconduct resulted in continuous, connected, and on-going harm to the Company.

171.     The Individual Defendants had the power and/or ability to, and did, directly or indirectly control or influence the Company's general affairs, including the content of public statements disseminated by KCS, and had the power and/or ability directly or indirectly to control or influence one another.

172.     Each of the Individual Defendants is jointly and severally liable to the same extent as any Individual Defendant is liable for breaches of fiduciary duty as set forth herein or violations of any other laws.

173.     As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages, as alleged herein.

174.    Plaintiff, on behalf of KCS, has no adequate remedy at law.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.    Against all the Individual Defendants for the amount of damages sustained by the Company as a result of the Individual Defendants' violations of federal securities laws, breaches of fiduciary duties, and unjust enrichment;

B.    Directing KCS to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable laws and to protect KCS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote the following Corporate Governance Policies:

1.    a provision to strengthen the Company's internal oversight and controls;

2.    a provision to strengthen the Company's controls over public disclosures;

3.    a provision to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

4.    a provision to permit the shareholders of KCS to nominate at least two new candidates for election to the Board; and

5.    a provision to strengthen the Board's supervision of the Company's financial reporting process, including the internal audit and control functions;

C.    Awarding to KCS restitution from the Individual Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Individual Defendants;

D.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs, and expenses; and

E.    Granting such other and further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury.

Dated: April 16, 2014                        DOLLAR, BURNS & BECKER, LC

*/s/Tim Dollar*
TIM DOLLAR   #33123
TOM HERSHEWE   #57642
1100 Main Street, Suite 2600
Kansas City, Missouri 64105
Telephone: (816) 876-2600
Facsimile: (816) 221-8763

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
SHAWN E. FIELDS
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone: (619) 230-0063
Facsimile: (619) 255-1856

*Attorneys for Plaintiff*